MORGAN, LEWIS & BOCKIUS LLP
JOHN H. HEMANN, SBN. 165823
MICHAEL P. MONAGLE, SBN. 239079
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: 415.442.1000
Fax: 415.442.1001
E-mail: jhemann@morganlewis.com
E-mail: mmonagle@morganlewis.com

Attorneys for Defendant Kitty Yee Li

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-06-0426 SI |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | DATE: September 17, 2010 |
| KITTY YEE LI, ET AL., | TIME: 11:00 am |
| Defendants. | |

# TABLE OF CONTENTS

| | | Page |
|---|---|---:|
| I. | INTRODUCTION | 1 |
| II. | LEGAL STANDARDS | 2 |
| III. | KITTY LI | 3 |
| IV. | THE OFFENSE CONDUCT | 5 |
| | A. The Offense | 5 |
| | B. The PSR's Flawed Description of the Offense Conduct | 5 |
| | C. The Government's Misleading Description of the Offense Conduct | 8 |
| V. | SENTENCING GUIDELINES CALCULATION | 9 |
| VI. | SENTENCING CONSIDERATIONS | 10 |
| | A. Seriousness of the Offense, Respect for the Law, Just Punishment | 10 |
| | B. Deterrence | 14 |
| | C. Protecting the Public | 14 |
| | D. Rehabilitation and Care | 14 |
| VII. | CONCLUSION | 14 |

## I. INTRODUCTION

Kitty Li was an hourly employee of a medical marijuana dispensary in Oakland, California. The dispensary, the Herb Cannabis Club ("HCC") operated openly and sold marijuana to customers who presented prescriptions. Ms. Li punched a time clock and was paid $10 an hour; she did not share in the profits of the enterprise. She was hired after meeting the owners of the HCC while an employee of the accounting firm they were using to do their books. Ms. Li was employed by the HCC for just about three years. She left her employment at the HCC voluntarily (after the City of Oakland decided not to renew HCC's *license*) and before the investigation of this case was known to her or her co-defendants.

Kitty Li does not have a single criminal history point. She's never been arrested, charged, or convicted of any felony, misdemeanor, or infraction.

Kitty Li has a long and productive work history – both before and after she was employed by the HCC. At the time of her arrest on August 29, 2006 – *over four years ago* – she was taking care of her sick mother and living at home (her mother has since passed away). Since her arrest, she has been on Pretrial Release and has performed spectacularly, including by finding and keeping a regular job. She has been a law-abiding and productive member of society.

The PSR, which we address in detail below, is an abomination. It appears to be largely a cut-and-paste from other presentence reports, it reflects little or no meaningful investigation into either the nature and circumstances of the offence or of Ms. Li, and it is rife with errors and unsupported conclusions. The Probation Officer did not address the detailed and specific objections to the draft presentence report and made a sentencing recommendation that is fundamentally unprincipled. The PSR and the recommendation revolve entirely around the marijuana distribution charges that the government has agreed to dismiss – and properly so, as there is no evidence that Kitty Li was more than the smallest cog in the alleged conspiracy.

The government's sentencing memorandum is not much better. It takes a few threads of evidence and attempts to weave it into a tapestry that shows an active member of a nefarious and obvious drug conspiracy. Much of the government's "evidence" is simply not true, and the rest is over-stated and hyperbolic. If the Court seriously entertains the government's contention that a

prison sentence is appropriate based on Ms. Li's minimal involvement in the Vince Wan/Alex Fong enterprise, we would request a formal evidentiary hearing so that the Court may hear and weigh the government's description of the evidence against the true facts.

We request that the Court impose a sentence of one year probation. Not a single purpose of sentencing would be served – even arguably – by imposing a term of imprisonment on Kitty Li. We ask the Court in this case not only to apply the law of Gall v. United States, but to consider the sentence imposed on Mr. Gall and affirmed by the Supreme Court. If probation was an appropriate sentence for Brian Gall, who played a much larger role in a significantly more serious offense, it certainly is an appropriate sentence for Ms. Li. Like Mr. Gall, Ms. Li voluntarily removed herself from the conduct before charges were filed, got and kept a steady job, and has lived a productive and entirely law-abiding life. Prison is not an appropriate alternative in this case and we respectfully request that the Court impose a short term of probation.

## II. LEGAL STANDARDS

This Court must consider all of the directives set forth in 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220 (2005). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of section 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- to afford adequate deterrence to criminal conduct;

- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Section 3553(a) directs sentencing courts to consider a number of additional factors, including:

- the nature and circumstances of the offense, § 3553(a)(1);

- the history and characteristics of the defendant, § 3553(a)(1);

1. - the kinds of sentences available, § 3553(a)(3);
2. - the sentencing guideline range, § 3553(a)(4);
3. - pertinent Sentencing Commission policy statements, § 3553(a)(5);
4. - the need to avoid unwarranted sentencing disparities, § 3553(a)(6);
5. - the need to provide restitution to any victims of the offense, § 3553(a)(7).

III. **KITTY LI**

Kitty Yee Li was born on June 18, 1973, in Hong Kong. She is the second of two children; her mother died of cancer in 2009 and her father lives in Hong Kong.

Ms. Li's parents divorced when she was five years old, after which she lived with her father and brother. During the week, however, Li stayed with a babysitter and went home only on the weekends. Ms. Li reported to the Probation Officer that she "saw my mother every day. She lived nearby and would cook for us. My mother did not like me though. My mother would never buy me new clothes. I only got 'hand-me-downs' from my brother. She also bought chocolates or candies and hid them from me. I was told that they were for my brother only. When we met people, my mother would only introduce my brother, but not me."

In 1997, Ms. Li immigrated to the U.S. on a student Visa and lived with her mother in San Francisco, California. By then, her mother was married and had another son. Ms. Li's relationship with her mother continued to be strained, and three months after arriving in the country, she moved in with a family in Oakland. She lived with the family for six years, until she met Vince Wan's wife Cynthia Liu and moved in with the couple.

Ms. Li lived with Mr. Wan and Ms. Liu until the couple divorced in 2004 and Ms. Liu moved back to Hong Kong. After that, she lived with a boyfriend, Mike Chen, for less than a year, before she stopped associating with Mr. Wan, Mr. Fong, and their associates. She lived for a year in Sacramento from 2005 to 2006.

In 2006, when Ms. Lien was diagnosed with cancer, Li moved back to live with her mother, until her death in June 2009. According to Li, "My mom changed after she found out about the breast cancer. We got along better after that." On August 29, 2006, when the defendant was arrested for this case, she was living at home with her mother, step-dad, and half

brother.

Far from being the drug criminal that the government seeks to portray, Ms. Li is humble and decent family person who, despite their troubled history, devoted the last two years of her life to caring for her ailing mother. Her brother, Raymond, describes this in his letter to the Court:

> It was fortunate that she was able to stay with our beloved mother during her final moments in this world. In September 2008, my mom was diagnosed recurrent triple negative breast cancer, a subtype of the disease statistically the worst among all breast cancer. Aggressive treatment was one of the two options; the other option is to leave the tumor untreated. We picked the former. My dad, Kitty and I all had a full time job, but Kitty had the worst schedule to work six days a week, 10 hours a day (included traffic). Still, Kitty managed to take mom to the clinics almost for every treatment. Radiotherapy was scheduled daily. After 8 months of aggressive treatments, the always happy, smiley, lovely and chubby mother of ours was taken to the emergency room on May 9th, 2009. She never made it out of the hospital. She spent six weeks of immobility and severe mental torture – prepare to leave the world, my mom lost the battle to cancer. Kitty was by her side at that time.

Exhibit A.

In 2007, Li met her future husband, Gao Ming Yi (Mr. Yi), age 47, in San Francisco. One year later, on November 13, 2008, they were married. Mr. Yi has a daughter, Flora Yi, age 18, who recently graduated from high school.

Ms. Li also has been steadily and gainfully employed since 2006. One friend, a dialysis nurse who Ms. Li met at work, "was very impressed by Kitty's commitment and loyalty to her employer. I noticed that she [] arrived early for work and typically never went on break for more than ten minutes at a time." Letter from Mario Puglia, Ex. A.

Her employer's report is even more glowing – and we ask that the Court read it carefully. Letter from Wah Yiu Lee, Ex. A. She was hired to work selling belts and buckles at the Stonestown mall and was quickly promoted to become the business' executive assistant. Ms. Lee's letter details Ms. Li's extensive responsibilities, but suffice it to say, here, that Ms. Lee finds Ms. Li to be "hard-working, reliable, responsible, smart, independent, and most important she is very sincere." Ex. A.

The theme, however, that emerges most prominently from the letters written on behalf of Ms. Li is that she is a kind, decent, honest person. "In my eyes," Ms. Lee writes, "she is very

simple, generous and she has a good heart." Mr. Puglia describes Ms. Li as a "gentle soul" who treats people with dignity, respect, and generosity. Another friend, Martina Szeto, describes Ms. Li's gentle and compassionate spirit, and kindness in times of trouble. Ex. A.

Wah Yiu Lee, Ms. Li's employer, concludes her letter with a plea that the Court should heed: "Everyone makes mistakes and I wish Kitty will be forgiven for her mistakes. I totally stand for her and I hope Kitty can move forward with our company until I retire." Ex. A.

## IV. THE OFFENSE CONDUCT

### A. The Offense

Ms. Li plead guilty to a single count of money laundering related to a single check for $4,769 written by Ms. Li to pay the rent at the HCC. This was the only time Ms. Li wrote a rent check for the HCC; she did it at the request of Mr. Wan, who paid her back. This is the offense to which Ms. Li pled guilty.

Ms. Li also has admitted, and provided the government with detailed proffers about, her employment with the HCC. Ms. Li performed a number of clerical and administrative activities for the HCC, which were a continuation the work performed by the Edward B. Wong accounting office for Mr. Wan. Occasionally, Ms. Li helped trim marijuana where it was being grown upstairs and participated in the sales on the first floor of the premises.

### B. The PSR's Flawed Description of the Offense Conduct

The PSR, under the heading "Offense Conduct," sets forth in great detail a story that is rife with inaccuracies, is poorly written to suggest that Ms. Li had a role much greater than the one she actually had, and that contains more information that *does not* involve Ms. Li than information that does concern her.

The draft PSR is simultaneously over-inclusive and under-inclusive: It contains paragraph after paragraph of "evidence" that has absolutely no connection to Ms. Li – seemingly cut-and-pasted from PSRs for other defendants. At the same time, it omits critical information that is directly relevant to Ms. Li's minimal culpability.

Taking the omissions first, the PSR is extremely misleading in that it suggests that Ms. Li played some broad role in the "Vince Wan" conspiracy. Quite to the contrary, Ms. Li's role was

minor and very low-level:

1. The evidence clearly demonstrates that all of Ms. Li's conduct involved a single location: the HCC dispensary in Oakland. The PSR suggests that the other locations were separate operations, when in fact they simply were the places that the marijuana that was sold at the HCC was grown. Obviously, the marijuana sold at the HCC had to be grown somewhere and Ms. Li had some very minor involvement in those operation. This point is critical because the PSR raises the inference that Ms. Li was part of an enterprise that was much larger than it really was, and not simply – as the evidence demonstrates – an employee of a single marijuana dispensary.

2. The HCC was licensed by the City of Oakland and operated openly and publicly. As far as Ms. Li knew, the HCC was just like any of the hundreds of medical marijuana dispensaries in the Bay Area – and licensed by the City of Oakland. Although this is no legal defense to federal marijuana charges, it is a critical point for sentencing because it goes directly to Ms. Li's culpability.

3. Further to this point, the HCC appeared to Ms. Li to be operating like a normal legitimate business. The HCC paid taxes. Indeed, one of Ms. Li's job responsibilities for a period of time was to keep track of the payroll for the purpose of paying payroll taxes. Further, Ms. Li was an hourly employee of the HCC, receiving less than $10/hour. She "punched" –in and –out, just like hourly employees of businesses throughout the state.

*4.* Ms. Li voluntarily left the employment of the HCC prior to any law enforcement activity became known to her. She disassociated from Mr. Wan, Mr. Fong, the other employees of the HCC, and the other individuals involved with Mr. Wan's alleged operation. She has not had anything whatsoever to do with any of these individuals since well before any charges were filed in this case. *She withdrew from the charged conspiracy voluntarily and before there was any reason to believe that anyone would be charged with a crime.*

5. Ms. Li became involved with the HCC as a result of her work for the accounting firm that had been doing the books for the HCC. Ms. Li merely continued to work in essentially the same job, simply as an employee of the HCC. Neither the accounting firm nor its principals

have ever been charged with anything. It is difficult to believe that Ms. Li would have thought that continuing the work she was doing as an employee of an accounting firm was part of some massive criminal enterprise.

6. Ms. Li was hired by the HCC because of her friendship with Mr. Wan's wife, Cynthia Liu, who introduced her to Mr. Wan and suggested that she leave the accounting firm and begin working directly for the HCC. Mr. Wan's wife has never been charged in connection with the case.

Apparently in lieu of including this relevant information about Ms. Li, the PSR recites at least 10 paragraphs under "Offense Conduct" that have absolutely nothing to do with Ms. Li at all. Paragraphs 17 through 26 of the PSR appear to describe the Vince Wan/Alex Fong organization and conspiracy. Ms. Li's name does not appear a single time in any of these paragraphs. It appears that this information was cut-and-pasted from PSRs involving other defendants who were involved in activities related to the Vince Wan/Alex Fong operations that went well beyond – both factually and historically – anything Kitty Li had anything to do with. The evidence reflected in these paragraphs has not been provided to Ms. Li in discovery and there is not a single reason to believe that she has even the barest knowledge of the facts alleged. This is a prime example how the PSR was written in a way that portrays Ms. Li's involvement in the Vince Wan/Alex Fong conspiracy as something far greater than it actually was.

The PSR continues by suggesting that Li was a member of a "network" and worked in a variety of separate businesses operated by Wan and Fong. These paragraphs also greatly overstate Li's role in the Wan/Fong operation. We address these inaccuracies, below, in responding to the government's sentencing memorandum.

Finally, the Probation Office simply punted in responding to Ms. Li's detailed objections to the draft PSR. See Ex. G and Addendum to the PSR. The Probation Officer appears to simply have accepted the government's version of events without conducting an independent evaluation of the evidence. We would, respectfully, request that if the Court is inclined to defer to the PSR's "offense conduct" as written, that the Court conduct an evidentiary hearing so that it can independently assess the relevant facts.

C. **The Government's Misleading Description of the Offense Conduct**

In its Sentencing Memorandum, the government compounds the errors of the PSR by misstating and exaggerating the evidence. While conceding that Ms. Li was not a major player in the Wan/Fong conspiracy, the government contends that she was somehow an important player and cites seven or so "facts" that are either wrong or exaggerated.

*Untruths.* Certain allegations by the government are, simply, not true.

1. "Li was involved in trimming and watering marijuana plants at other locations, as well as performing bookkeeping-like duties, such as paying the rent and utility expenses for these sites." This assertion is not true.

2. "Li worked at Crystal Diamond Cannabis Clinic ("CDCC"), a marijuana dispensary operated by co-defendants Jay Yuan, Vince Wan, and others. In addition to handling the bills and invoices of this dispensary, Li was responsible for finding marijuana grow houses for CDCC's marijuana supplies." These assertions are not true.

3. "Li, along with co-defendant Alex Fong and other individuals, operated and maintained grow houses at 4026 35th Avenue and 1823 Central Avenue, both in Oakland, California." This assertion is not true.

*Exaggerations.* The government's remaining allegations are disappointingly exaggerated.

1. "The defendant was also HCC's bookkeeper – she handled the billing and invoices at this marijuana dispensary and was responsible for paying for its expenses, such as utility payments." The truth is that Ms. Li was never in charge of keeping the "books" of the HCC; she helped with the payroll (including with paying payroll taxes), she sometimes logged sales to HCC customers, and she occasionally made utility payments. Notably, she inherited some of her duties from the accounting firm where she worked before she was hired by Mr. Wan and Ms. Liu. As far as we know, the accounting firm's principles never were charged for aiding Mr. Wan.

2. "Li actively searched Asian newspapers for houses owned by Asian owners that she and her co-conspirators could use as marijuana grow houses." Once. She did this *one time*, with her boyfriend, who was asked by Mr. Wan to do it.

3. "Li was the PG&E subscriber of record" for 1171 MacArthur Boulevard. For *one*

*month.* She did not live there and, therefore, transferred the account to Mr. Leung. She did this because she was told to do it. She had nothing to do with this property when it operated as a grow-house and was no longer associated with Mr. Wan when the search occurred in June 2005 – though the Court would not know that from reading the government's brief.

    4. "[C]o-defendant Vince Wan instructed all the grow site workers, including Li, to obtain Proposition 215 cards, even if they were not sick, so that they would not get in trouble with law enforcement." There is no evidence that Li received this instruction.

It is shocking and unfortunate that the government felt the need to exaggerate. What is true is that Ms. Li did some clerical work, occasionally paid the rent and utilities, looked for one building on one occasion to use as a grow house for the HCC, and periodically trimmed marijuana plants at the HCC facility in Oakland. The HCC was a regular business that operated openly, had employees who used time clocks, and paid taxes. Her work revolved entirely around the HCC business; and when the City of Oakland refused to renew the HCC's license, she no longer had a job. The government is, of course, correct when it observes on page four of its sentencing memo that a business cannot operate unless the little people do their part – such as depositing the checks. It is not correct, however, to assume that "the conspiracy would not have lasted as long as it did" without Ms. Li's involvement or that her "participation in the financial aspect of the conspiracy . . . helped the conspiracy . . . avoid law enforcement detection" – and there is absolutely no evidence to support these conclusions.

We are by no means trying to suggest that Ms. Li was not an employee of a marijuana dispensary. Indeed, our point is that Ms. Li *was an employee of a marijuana dispensary.* The government's effort to paint this as an evil that deserves prison time (let alone 18 months in prison) is unprincipled, disproportionate, and mean-spirited. If the Court is inclined to accept the government's version of the facts, we would request an evidentiary hearing to test the government's evidence and present more accurate evidence as to the operation of the HCC.

## V.   SENTENCING GUIDELINES CALCULATION

We agree with the sentencing guideline calculation, except for the Probation Officer's refusal to recommend a downward adjustment for minimal role. Any reasonable interpretation of

the evidence reveals that Ms. Li played an exceptionally minimal role – so minimal that more than half of the offense conduct alleged in the PSR had nothing whatsoever to do with her.

A minimal role reduction under USSG §3B1.2 would reduce the offense level from 15 to 12, which would make the guideline range 10-16 months. We believe that this is still far too draconian a sentence in this case and would urge the Court to make both a minimal role adjustment *and* impose a sentence of probation after consideration of the § 3553(a) factors.

## VI. SENTENCING CONSIDERATIONS

In determining the appropriate sentence, 18 U.S.C. section 3553(a)(2) directs the Court to consider four objectives: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Fair consideration of each of these objectives demonstrates that a sentence of probation is appropriate.

### A. Seriousness of the Offense, Respect for the Law, Just Punishment

Consideration of these factors – seriousness of the offense, respect for the law, and just punishment – dictates a sentence of probation in this case.

*Seriousness of the offense.* The offense to which Ms. Li pleaded guilty was money laundering related to a single $4,000+ rent check in 2003. That offense, of course, is not serious in either an absolute or relative sense, if compared to almost any federal crime.

The government will, of course, argue that the conduct was serious because it was part of the "Vince Wan Conspiracy." But even a cursory examination of Kitty Li's role reveals that her conduct was not serious. Ms. Li was a clerk in a marijuana dispensary. She punched a time clock and was paid approximately $10/hour. One of her jobs for a period of time was ensuring that payroll taxes for the other hourly employees were paid to the state and local governments. She did not participate in the profits from the marijuana sales and did not play any sort of leadership or managerial role in the business. She worked for the HCC for less than three years and left her employment voluntarily and before she was charged in this case.

Most importantly, there is no evidence that Kitty Li knew about or participated in the "conspiracy" beyond working as an employee of the HCC. *All* of her conduct was directly related to the clerical position she held at the HCC and all of that conduct was at the direction of the managers of the business. There is no evidence that Ms. Li believed that the operation of the HCC was illegal or that her conduct was part of a criminal conspiracy.

This is where the PSR is especially nefarious and unjust. The *majority* of the information contained the "offense conduct" section of the PSR (¶¶ 17-20) has absolutely nothing to do with Kitty Li and there is no evidence that she either knew about it or participated in it in even the most minimal fashion. Moreover, even the allegations that concern Ms. Li's employment at the HCC unfairly attempt to tie her, without any evidentiary support, to the Vince Wan/Alex Fong enterprise without any evidentiary support. For example:

> 32. In late 2003, Wan managed an *unspecified* facility, located in San Pablo, *which has never been fully described*. Nevertheless [?], Fong supervised this indoor grow site, where he was responsible for paying the workers and securing the supplies. Li was also involved in this facility by delivering funds used by Fong for expenses, including rent. *No specific amount of marijuana was associated with this location.*

PSR ¶ 32 (emphasis added). Although the Probation Officer generously notes Ms. Li's objection to this hopelessly vague and unsupported allegation, it remains in the PSR and is used as an example of Ms. Li's supposedly extensive participation in the Wan/Fong enterprise. It is, to be blunt, rubbish – along with similarly vague and unsupported allegations in paragraphs 30, 31, 33, and 34 of the PSR.

Importantly, even if *all* of the conduct alleged in the PSR that concerned Li (specifically excluding the irrelevant "background" of the conspiracy in paragraphs 17 through 26, which no one contends had anything to do with Li) is considered, her conduct was not "serious" compared with the conduct of the other criminal defendants this Court routinely sentences. It is difficult, indeed, to believe that the government truly believes that delivering rent checks and paying utility bills for a marijuana dispensary is serious conduct. This is a case devoid of violence, deceit, or profit – it is a case about an hourly employee of a business operating in the open.

*Respect for the Law.* A prison sentence in this case would not promote respect for the

1 | law. Ms. Li's crime was to pay the rent for a marijuana dispensary and her broader conduct
2 | involved acting as a short-term, hourly employee for the dispensary performing clerical tasks.
3 | There are *dozens*, if not *hundreds,* of marijuana dispensaries operating openly in the San
4 | Francisco Bay Area today. Attached as Exhibit B are Cannabis Club Directories for the East Bay
5 | and San Francisco/North Bay areas; the Oakland directory alone lists *45* dispensaries. In 2004-
6 | 2006, the revenue from marijuana dispensaries in Oakland was almost $50 million, which
7 | resulted in over $4 million in tax income to the City of Oakland. See Exhibit C.

8 | What this means is that there are hundreds of Kitty Li's employed as hourly-wage earners in the Northern District of California. If it wanted to, the U.S. Attorney's office could arrest and prosecute dozens of people a week for doing precisely what Kitty Li is accused of doing. However, the government, currently, is doing *absolutely nothing* to enforce the federal marijuana laws against people in Ms. Li's position. Ex. E. Indeed, there is an active debate on both the federal and state levels as to whether marijuana should be legalized for both medicinal and recreational use. See Exhibit D and California Proposition 19 (the "Marijuana Legalization Initiative").

Imprisoning Ms. Li for acting as a clerical employee of a marijuana dispensary in Oakland from 2003-2005 will do absolutely nothing to promote respect for the law. Indeed, it would reveal law enforcement as, at best, inconsistent and arbitrary and, at worst, irrational and mean-spirited. Kitty Li should not have been prosecuted in the first instance. To lock her in prison for being employed for a short time in a job that hundreds if not thousands of Californians are doing today, would be a gross injustice.

*Just Punishment.* There would be no justice in imprisoning Kitty Li, for the reasons set forth above, and for the following reasons:

1. Kitty Li has had absolutely no contact with law enforcement whatsoever, other than through this case. This is not a person who has had arrests, but no convictions – or convictions that do not result in criminal history points. This is a person who has never done anything remotely criminal.

2. This case would not be prosecuted today in federal court or ever in California state

court. There simply is no analogous crime or criminal with whom to compare Ms. Li – because no one else in her circumstance gets prosecuted. It would not be just to imprison Kitty Li, when hundreds or even thousands of people just like her do not ever get charged.

3. Imprisonment for this offense is not consistent with the values of the community and, therefore, is not just. The law in California, as a result of Proposition 215, is that medicinal marijuana is legal. A plurality of Californians and a clear majority of people in the Bay Area believe that marijuana use should be legalized. Exhibit F. This is *not* to say that federal law does not preempt and supersede state law, it is to say that imprisonment is not just by prevailing community standards in these circumstances.

4. Ms. Li voluntarily stopped working for the HCC in 2005, before there was any known threat of prosecution. When the City of Oakland said it would not renew the HCC's license in 2005, Ms. Li's employment ended. She did not continue to work for Wan or Fong. This point deserves special attention: It was the non-renewal of a *government license* that caused Ms. Li to stop working for the HCC. It is rather difficult to ascribe ill-motive to a person who works for a business while it is licensed and then stops working when the license, and thus the business, expires.

5. Ms. Li has lived an entirely law-abiding life and has been steadily and productively employed since 2006. Her record on Pretrial Release has been exemplary. Her work record, including promotions and responsibilities, is exceptional. It would be fundamentally counterproductive to remove a person from productive employment to imprison her because she worked as a clerk in a marijuana dispensary 6 years ago. (Indeed, is seems rather absurd even to have to argue the point.)

6. Ms. Li is a decent and responsible person. She took a job with a group of people who, apparently, were engaged in a large-scale criminal enterprise – an enterprise much larger than the small part that Mr. Li played in it. Kitty Li is no drug dealer; she was an hourly employee who did not participate in the profits. As her brother puts it, "She did not live a luxurious life, nor did she have stacks of dollars stored in a vault, nor did she have the capability to be part of a criminal organization. . . . In Kitty's case, the damage she has done was to be a

friend and made the wrong decisions to help her friends."

B. **Deterrence**

The Court must take into consideration whether the interest of deterrence will be served by the sentence imposed. There simply is no argument that a prison sentence, here, will act as either specific or general deterrence. Specifically, there is not a shred of evidence that there is any danger that Ms. Li will re-offend. Neither statistically nor anecdotally is there any reason to believe that Ms. Li will ever commit another crime of any type. Indeed, given Ms. Li's lack of criminal history and other characteristics (gender, lack of drug use, lack of violence, employment, marital status, etc.), there is virtually *no likelihood whatsoever* that she would re-offend, based on studies done by the Sentencing Commission. See U.S. Sentencing Commission, *Recidivism and the "First Offender"* (May 2004).

The government asserts that an 18 month sentence "will serve as an adequate deterrent for this defendant." They offer no support for this position, clearly because none exists.

C. **Protecting the Public**

Nor is there any reason to believe that the public needs to be protected from Ms. Li. Ms. Li is, and has been, gainfully employed at the same company since 2006. Other than this case, she has a crystal-clean record.

Moreover, the issue of protecting the public begs the question, "protecting the public from what?" People paying the rent and utilities for marijuana dispensaries? If the U.S. Attorney's Office is truly interested in that, we would respectfully refer them to Exhibit B and suggest that they get to work.

D. **Rehabilitation and Care**

Kitty Li does not need rehabilitation or care now. Prison would only increase the likelihood that she would need some in the future.

VII. **CONCLUSION**

Kitty Li should not be imprisoned. No social virtue or criminal justice purpose is served by incarceration. She has proven over the last four years that she is no criminal and, quite to the contrary, she is a productive and positive member of our community. She is not dangerous; she

does not have malice in her heart or demonstrate it in her conduct. Her criminal conduct is something that would not be prosecuted were it to occur today – and indeed is something that thousands of Californians are openly engaged in even as the sentencing hearing in this matter takes place.

We respectfully request that the Court impose a sentence of one year probation and bring this case to a long overdue end.

Dated: September 15, 2010

MORGAN, LEWIS & BOCKIUS LLP
JOHN H. HEMANN
MICHAEL P. MONAGLE

By _____
John H. Hemann
Attorneys for Plaintiff
Kitty Yee Li